# United States Court of Appeals
## For the First Circuit

No. 12-1405

SUSAN K. YOUNG,

Plaintiff, Appellant,

v.

WELLS FARGO BANK, N.A. AS TRUSTEE FOR OPTION ONE MORTGAGE LOAN
TRUST 2007-CP1, ASSET BACKED CERTIFICATES, SERIES 2007-CP1;
AMERICAN HOME MORTGAGE SERVICING, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. Magistrate Judge]

Before

Howard, Stahl, and Lipez,
Circuit Judges.

Anthony Alva for appellant.
Marissa I. Delinks, with whom Maura K. McKelvey, and Hinshaw
& Culbertson LLP were on brief, for appellees.

May 21, 2013

**LIPEZ, Circuit Judge**.   In an attempt to avert the foreclosure of her home, plaintiff Susan Young sought to modify the terms of her mortgage pursuant to the Home Affordable Modification Program ("HAMP"), a federal initiative that incentivizes lenders and loan servicers to offer loan modifications to eligible homeowners.   When Young's efforts did not result in a permanent loan modification, she sued defendants Wells Fargo Bank, N.A. ("Wells Fargo") and American Home Mortgage Servicing, Inc. ("AHMS"), alleging that their conduct during her attempts to modify her mortgage violated Massachusetts law.   Defendants moved to dismiss her complaint under Federal Rule of Civil Procedure 12(b)(6).   The court granted defendants' motion in its entirety. Young now appeals the judgment.

Young is one of many residential mortgagors who have brought cases against lenders and loan servicers arising out of attempts to modify loans under HAMP.   As a result, courts in many jurisdictions, including our own, are grappling with the influx of these cases and the complex legal issues that they raise. Notwithstanding the window that Young's case provides into the ongoing consequences of the housing market's rise and fall, our review is confined to the allegations contained in the complaint and the parties' arguments on appeal.   After careful evaluation of Young's pleading and the parties' contentions, we affirm the district court's judgment as to the dismissal of Young's breach of

contract claim under Count II, her claim for breach of the implied covenant of good faith and fair dealing, and her claims for intentional and negligent infliction of emotional distress. We vacate the dismissal of her breach of contract claim under Count I, her claim under Chapter 93A, and her derivative claim for equitable relief, and remand for further proceedings consistent with this opinion.

## I.

### A.  Background on the Home Affordable Modification Program

In an effort to mitigate the destabilizing effects of the financial crisis of 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA"), Pub. L. No. 110-343, 122 Stat. 3765. EESA authorized the Secretary of the Treasury to, inter alia, "implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages" to minimize foreclosures. Id. § 109; 12 U.S.C. § 5219(a)(1). To effectuate these goals, the Secretary was given the power to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." Id. Pursuant to this authority, the Secretary created an array of programs designed to identify likely candidates for loan modifications and encourage lenders to renegotiate their mortgages. HAMP is one of these programs.

HAMP urges banks and loan servicers to offer loan modifications to eligible borrowers with the goal of "reducing [their] mortgage payments to sustainable levels, without discharging any of the underlying debt." Bosque v. Wells Fargo Bank, N.A., 762 F. Supp. 2d 342, 347 (D. Mass. 2011); see generally Jean Braucher, Humpty Dumpty and the Foreclosure Crisis: Lessons from the Lackluster First Year of the Home Affordable Modification Program, 52 Ariz. L. Rev. 727, 748-53 (2010) (providing background on HAMP's features). The Secretary, through Fannie Mae, entered into agreements with numerous home loan servicers, including Wells Fargo, pursuant to which the servicers "agreed to identify homeowners who were in default or would likely soon be in default on their mortgage payments, and to modify the loans of those eligible under the program." Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 556 (7th Cir. 2012). The servicers are to conduct an initial evaluation of a particular homeowner's eligibility for a loan modification using a set of guidelines promulgated by the Treasury Department. Id. If the borrower meets those criteria, "the guidelines direct the servicer to offer that individual a Trial Period Plan ('TPP')" as a precursor to obtaining a permanent modification. Markle v. HSBC Mortg. Corp. (USA), 844 F. Supp. 2d 172, 177 (D. Mass. 2011). If the borrower complies with the TPP's terms, including making required monthly payments, providing the necessary supporting documentation, and maintaining eligibility,

-4-

the guidelines state that the servicer should offer the borrower a permanent loan modification.  See Wigod, 673 F.3d at 557; see also Markle, 844 F. Supp. 2d at 177 ("The standard-form TPP represents to borrowers that they will obtain a permanent modification at the end of the trial period if they comply with the terms of the agreement.").  Loan servicers receive a $1,000 payment for each permanent modification, in addition to other incentives.  Wigod, 673 F.3d at 556.

## B.  Young's Complaint

We now turn to the facts of Young's case, drawn from her complaint and various documents incorporated by reference.  Young purchased a home in Yarmouth, Massachusetts, on or about September 9, 1997.  About nine years later, in September 2006, she obtained a mortgage on the property of about $282,000.  Wells Fargo is the current mortgagee, and AHMS acted as servicer for the note.  This mortgage provided for an initial interest rate of 7.8%, subject to change on September 1, 2008, and every six months thereafter.[1]

---

[1] The complaint alleges that in February 2010, Wells Fargo sent Young a letter "increasing" her interest rate to 7.8%.  Young has not appended this letter to her complaint or otherwise proffered it for our review, but the complaint states that this letter contradicted the terms of her mortgage, which locked her rate at 2% for the first five years.  To the contrary, an adjustable rate rider attached to the mortgage provides that the "initial interest rate" is 7.8%, subject to alteration starting on September 1, 2008.  Young has neither disputed the authenticity of this document, nor pointed to any language in her mortgage agreement that supports her allegation.  As a consequence, to the extent that Young is claiming that her mortgage locked her interest rate at 2% for a period of time, that allegation is not entitled to

In 2008, Young began falling behind on her mortgage payments after her father died and her income was reduced due to the recession. In August 2008, she sent a $2,600 payment to Wells Fargo in an effort to bring her payments up to date. Shortly thereafter, a notice was posted on her door stating that she was late on her mortgage payment, but instructing the homeowner to ignore the notice if she had already made the payments in question. When Young called Wells Fargo on or about August 27, 2008, she was told that while her payment had been received, the bank would not process her check and intended to initiate foreclosure proceedings.

After a week of negotiations, Young agreed to send Wells Fargo a $5,628.42 check, in exchange for which Wells Fargo would fax her a forbearance agreement. Young sent the check, but did not receive a forbearance agreement in response. On September 8, 2008, Young contacted the bank and was told that "there was not an agreement." After insisting that she had been promised a forbearance agreement, she was referred to a supervisor. This

---

the presumption of truth. See Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.") (quoting N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir. 1998)).

Young may be suggesting that, regardless of her mortgage terms, she was charged a more favorable interest rate for the first few years of her mortgage and that defendants later restored her rate back to what the mortgage originally required. If this was her meaning, it is far from clear from the complaint's language, and our review is limited to the facts contained in the pleading and the contents of documents cognizable under Rule 12(b)(6).

supervisor told Young that the August 2008 check for $2,600 had not been processed, and acknowledged that if this check had been processed, Young would be up to date on her payments. The supervisor also admitted that Wells Fargo was at fault for not processing the check and represented that if Young signed a forbearance agreement, the bank would cease foreclosure proceedings and process both the August and September checks.

Although Young was faxed the agreement, she was surprised to find that it required her to pay $3,144.32 monthly, $800 more than her previous payments. Still, she apparently executed the forbearance agreement and made an effort to abide by its terms. By April 2009, however, Young could not sustain these payments and she stopped making them.

Young "implored [defendants] to work with her so she could save her family's home" by modifying the terms of her mortgage. She obtained assistance from a lawyer, who helped her negotiate a modification. In October 2009, she received written confirmation that she may be eligible for a loan modification under HAMP. Wells Fargo sent her a packet with three payment coupons for her first three monthly payments, as well as a TPP. The TPP required that she make three monthly payments in the amount of $1,368.94 each in order to qualify for a permanent loan modification. Young executed and mailed the TPP on October 19,

2009 and subsequently made three monthly payments from November 2009 through January 2010.

Despite Young's payments, the bank sent Young a written notice in January 2010 denying her a permanent loan modification contract, claiming it did not receive all TPP payments on or before the 30th day from the due date of the last trial period payment. Young alleges that this letter "emotionally traumatized" her and that she "couldn't believe" that Wells Fargo had refused to accept or acknowledge the payments. Young's counsel then contacted Wells Fargo and was advised that the January 2010 letter was sent in error and that Young should simply ignore it. Wells Fargo's agent also verbally confirmed that Young would be sent a permanent modification agreement. Young continued to make "numerous calls and requests" to Wells Fargo, asking that she be sent a permanent contract. Wells Fargo continued to ignore Young's inquiries until her counsel intervened yet again. At that point, a Wells Fargo employee assured Young's counsel that a permanent modification agreement would be sent in three to four weeks.

On or about June 14, 2010, Young received the permanent modification agreement. This agreement increased Young's monthly payments from her trial period payments by almost $300, for a total of $1658.71 per month. Although not alleged explicitly in the complaint, Young evidently did not sign the permanent modification

agreement and defendants moved forward with the foreclosure process.[2]

Young pleads that she "was emotionally devastated by this course of events" and experienced constant nervousness, anxiety, and stress. These problems "impeded her decision making process [and] her ability to earn income," and engendered "arguments and dissent between her friends and relatives." She alleges that this "extreme stress" was the primary cause of her separation from her husband.

After sending Wells Fargo a pre-suit demand letter on January 29, 2011, Young filed a complaint in the Commonwealth courts alleging violations of Massachusetts law. Defendants removed the case, invoking the court's diversity jurisdiction, and then moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). While this motion was pending, Young moved to amend her complaint to add additional allegations and causes of action. Defendants, with the court's leave, filed a motion to dismiss the proposed amended complaint.[3] The court granted Young's request to amend and denied defendants' first motion to dismiss as moot. The court then granted defendants' second motion in its entirety,

---

[2] Defendants' brief states that the foreclosure sale has not yet been scheduled.

[3] While these motions were pending, the parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c).

-9-

dismissed the amended complaint, and entered judgment.  This timely appeal followed.

## II.

We exercise de novo review over the dismissal of a complaint under Rule 12(b)(6).  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011).  Under this standard, we take "as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor."  Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 5 (1st Cir. 2011).  We may also rely on any documents attached to the complaint or incorporated by reference therein.  See In re Citigroup, Inc., 535 F.3d 45, 52 (1st Cir. 2008) (stating that court "may also review documents outside of the pleadings where they are undisputed, central to plaintiffs' claims, and sufficiently referred to in the complaint or incorporated into the movant's pleadings").

In evaluating the sufficiency of the complaint, we first disregard all conclusory allegations that merely parrot the relevant legal standard.  See Ocasio-Hernández, 640 F.3d at 12.  We then inquire whether the remaining factual allegations state a plausible, rather than merely a possible, assertion of defendants' liability.  Id.; see also Sepúlveda–Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010) ("[T]he combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.").

-10-

Here, the parties agree that Massachusetts law governs Young's claims, "and we review de novo the district court's interpretation of [Commonwealth] law." Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 49 (1st Cir. 2009). The dismissal may be affirmed on any basis in the record. See Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2011). With these principles in mind, we turn to the causes of action pled in the complaint.

## A. Breach of Contract

Under Massachusetts law, the interpretation of a contract "is . . . a matter of law for the court." Artuso, 637 F.3d at 5-6; see also Lewis v. Commonwealth, 122 N.E.2d 888, 889 (Mass. 1954). When the contract's terms are "ambiguous, uncertain, or equivocal in meaning, [however,] the intent of the parties is a question of fact to be determined at trial." Seaco Ins. Co. v. Barbosa, 761 N.E.2d 946, 951 (Mass. 2002). Young's complaint pleads two separate counts of breach of contract, and the first count includes two theories of breach. We address each count in turn.

### 1. Count I

Count I alleges that the TPP was a negotiated contract between Young and defendants, and that defendants breached its provisions. The basic elements of a contract claim under Massachusetts law are familiar: "[the] plaintiff[] must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff[] sustained damages as a result

-11-

of the breach."  Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007).  The parties' arguments focus on whether defendants breached the TPP.  Specifically, Young contends under Count I that defendants breached the agreement in two ways by: (1) requiring higher payments under the permanent modification agreement than the payments demanded under the TPP; and (2) failing to proffer a permanent modification agreement before the conclusion of the three-month trial period.

### a.  Increased Payments

Young's complaint alleges that Wells Fargo "reassured [her] that the Modification Agreement would be continued under its previous terms" and that the bank "breached the contract by attempting to unilaterally modify it, and charge a higher monthly modified mortgage payment."  Stated differently, she contends that the bank breached the TPP by increasing the payments due under the permanent modification agreement by almost $300 from the amounts she paid during the trial period.

To the contrary, the TPP unambiguously distinguishes between the payments Young agreed to make under the trial period plan and the payments she would ultimately owe under the permanently modified loan terms.  For example, in Section 2, Young represented that she would pay Wells Fargo "the trial period payment" of $1,368.94 on a monthly schedule.  Section 2 is clear that "[t]he Trial Period Payment is an estimate of the payment that

-12-

will be required under the modified loan terms," and that "[t]he actual payments under the modified loan terms . . . may be different." (emphases added). Section 3 of the TPP then describes the process Wells Fargo would undertake to calculate her "actual payments," stating that once the bank determined the "final amounts of unpaid interest and any other delinquent amounts (except late charges)" and deducted "any remaining money held at the end of the Trial Period," the "new payment amount" would be set. The TPP further clarifies that the trial plan "is not a modification of the Loan Documents" and that the underlying loan will not be modified absent compliance with the TPP's terms.

Taken together, these provisions draw a crystalline distinction between the trial period payment amount and the monthly amount owed under the permanent modification. Young cites no language in the TPP that barred Wells Fargo from altering that payment amount after the trial period's conclusion. Indeed, the TPP's plain terms expressly allow for such an alteration. Young also suggests that she should have been given some notice of defendants' intent to alter her monthly payments, but a careful review of the TPP reveals that it imposes no such obligation. See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 149 n.1 (2d Cir. 2012) (stating that facts pled in complaint are taken as true unless "conclusory or contradicted by . . . documentary evidence"). Consequently, Young has failed to state a

breach of contract claim based on the mere fact that the permanent modification agreement increased her monthly payments.[4]

### b. Timeliness

Young's second theory of liability is that Wells Fargo breached the TPP by failing to send her a permanent modification agreement either before or at the end of the three-month trial period. Young notes that per the TPP, the "trial period" begins on the plan's effective date and ends on the earlier of either the "modification effective date" or the plan's termination. The modification effective date, in turn, is defined as the first day of the month after the due date of the last trial period payment. In Young's case, her last trial payment was due in January 2010,

_____

[4] One of our sister circuits has suggested that a contract claim may lie if the increased payment resulted from a misapplication of HAMP guidelines. Addressing a TPP that was substantially similar, if not identical, to the one at issue here, the Seventh Circuit observed that HAMP provided an "'existing standard' by which the ultimate terms of [a] permanent modification were to be set." Wigod, 673 F.3d at 565. In dicta, the court noted that "[a]lthough the trial terms were just an 'estimate' of the permanent modification terms, the TPP fairly implied that any deviation from them in the permanent offer would also be based on Wells Fargo's application of the established HAMP criteria and formulas." Id. The Wigod court indicated that an improperly calculated increase in payments from that provided for in the TPP may give rise to a contract claim. Id.

This reasoning suggests that while the TPP's plain terms preclude a contract claim based on the mere fact that the permanent modification required increased payments, a plaintiff may be able to assert a claim that the increase was improperly or unfairly calculated. Young's complaint does not clearly plead a contract claim based on this theory, however. While she urged a similar reading of her complaint before the district court, she failed to do so in her opening brief on appeal. We therefore deem that argument waived and express no opinion on its merits.

-14-

meaning her modification effective date was February 1, 2010. She contends that this provision, in conjunction with the TPP's "time is of the essence" clause, required Wells Fargo to tender a permanent modification before the end of the trial period. This theory would mean that defendants breached the TPP by sending her a permanent modification agreement five months later, only after a series of attempts to clear up Wells Fargo's erroneous January 2010 rejection letter.

Defendants respond that we are precluded from considering this argument on appeal because the complaint does not plead a theory of breach based on a failure to tender a permanent modification by a certain date. They are wrong. The complaint states numerous facts related to Wells Fargo's repeated mistakes and delays in offering her a permanent modification, including that the end of the trial period passed without the proffer of a permanent modification agreement. Although Count I of her complaint is pled in a muddled fashion, her claim incorporates those factual allegations by reference and states that defendants breached their duty to abide by the contract's terms. To be sure, Count I does focus on the bank's "unilateral" decision to charge her higher payments under the permanently modified loan terms. But it also states various other ways in which defendants breached their duty to perform, including the incorrect January 2010 letter

refusing Young a permanent modification.[5]  These allegations were enough to put defendants on notice of the breach at issue.

Defendants further assert that Young has waived this theory of breach by raising it for the first time on appeal.  The record shows otherwise.  Young's opposition to the motion to dismiss before the district court discusses both the "time is of the essence" provision and the provisions describing the temporal limits of the trial period.  The opposition brief also argues that defendants breached the TPP by failing to give her either a written notification of her status or a permanent modification offer prior to the modification effective date.[6]  While her brief "does not state [her] claim artfully," United States v. Dunbar, 553 F.3d 48, 63 n.4 (1st Cir. 2009), she timely brought it to the district court's attention and it is therefore preserved for our review.

---

[5] For example, Count I alleges that defendants "had a duty . . . to abide by the Contract," and that defendants engaged in "negligent conduct . . . [that] occurred at least twice before it breached the Modification Agreement, first on[] or about January 13, 2011, when it mistakenly, and admittedly, sent a letter . . . stating the Modification Agreement was terminated . . . ."

[6] Young's opposition brief to the district court describes various ways in which the defendants "intentionally, and/or negligently, violated" the TPP.  The brief goes on to note that Section 2 of the TPP describes the beginning and the end of the trial period, which ends on the modification effective date.  Young then says that "after setting up a three month trial period," at that period's conclusion defendants "took no action to give her any written, or reliable notice whatsoever, as to her status under the program."

Turning to the merits of Young's argument, we conclude that the "time is of the essence" provision does not bear the weight that Young gives it.  The provision's language is linked to Young's obligation to "make all payments on or before the days that they are due" during the three-month trial period, rather than to all of the parties' performance obligations under the TPP.[7] Nonetheless, other provisions contemplate that Wells Fargo would make such an offer prior to the modification effective date, as long as Young was complying with her end of the bargain.  The TPP's very first sentence states, in mandatory language, that "[i]f [Young] is in compliance with [the TPP] and [her] representations . . . continue to be true in all material respects, then the Lender will provide [her] with a Home Affordable Modification Agreement . . . as set forth in Section 3." (emphases added).  Section 3 echoes this statement, providing that if Young complies with certain conditions, sends Wells Fargo any information necessary to assess her eligibility for a permanent modification, and represents her financial situation truthfully, "the Lender will send [Young] a Modification Agreement for [her] signature which will modify [her] Loan Documents as necessary." (emphases added).  Young's complaint

[7] The provision states in full:
"I agree that during the period (the 'Trial Period') . . . I understand and acknowledge that:
    "A.  TIME IS OF THE ESSENCE under this Plan.  This means I must make payments on or before the days that they are due."

-17-

clearly alleges that she performed all of her obligations under the TPP, a fact defendants do not dispute. The TPP's plain terms therefore required Wells Fargo to offer her a permanent modification. See Wigod, 673 F.3d at 562 ("[A] reasonable person in Wigod's position would read the TPP as a definite offer to provide a permanent modification that she could accept so long as she satisfied the conditions.").

As to when defendants should have met that obligation, Section 3 says that the permanent modification agreement, "as of the Modification Effective Date," will preclude a buyer or transferee of the property from assuming the loan unless otherwise permitted by state or federal law. The purpose of this provision is to dispel any notion that a prospective purchaser of the property could take advantage of HAMP's loan modification process and assume a mortgage on particularly favorable terms. Thus, this provision assumes that the permanently modified loan terms would be in place as of the modification effective date. Similarly, Section 3's last sentence states as follows:

> Provided I make timely payments during the Trial Period and both the Lender and I execute the Modification Agreement, I understand that my first modified payment will be due on the Modification Effective Date (i.e. on the first day of the month following the month in which the last Trial Period Payment is due).

This part of Section 3 ties Young's payment obligations under the permanently modified loan terms to the modification effective date,

-18-

and contemplates that the permanent modification agreement would be duly executed <u>before</u> that date. Assuming that the permanent modification agreement was duly executed, the TPP would terminate on the modification effective date, the permanent modification agreement would activate, and Young would be obliged to make her first modified payment on the modification effective date. Accordingly, these provisions are reasonably susceptible to the interpretation that if Young continued to fulfill her obligations under the TPP, she should have received a permanent modification agreement sometime before the modification effective date. This reasonable reading of the TPP provides for a smooth transition from the trial period to the permanent modification.

In response, defendants contend that they "had no obligation to tender a permanent loan modification" by the modification effective date, relying specifically on Section 2(G). This section says that the TPP "is not a modification of the Loan Documents and that <u>the Loan Documents will not be modified unless and until</u> (i) I meet all the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) <u>the Modification Effective Date has passed</u>." (emphases added). This last clause, defendants argue, suggests that they need not offer the permanent modification until some undefined point after the modification effective date. Although this reading is not implausible as a matter of language, defendants invoke it to

advance the unreasonable proposition that they can unilaterally render large swaths of the TPP nugatory. In particular, defendants' interpretation would permit them to exercise an unfettered right to withhold a permanent modification offer for an uncertain period of time after the modification effective date has passed, thereby erasing the benefits to the plaintiff of her compliance with the TPP.

In any event, the most that defendants' arguments have done is inject a degree of ambiguity into the contract. They fall far short of showing that the only reasonable interpretation of the TPP supports their position. Because the contract could plausibly be read in Young's favor, and the complaint's allegations indicate that defendants breached the contract by failing to provide a permanent modification agreement by the modification effective date, she has done enough to survive a motion to dismiss. See Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005) ("We are not obliged to accept the allegations of the complaint as to how to construe [a contract], but at this procedural stage, we should resolve any contractual ambiguities in favor of the plaintiff.").

For these reasons, we vacate the dismissal of Count I of Young's complaint.[8]

---

[8] Of course, a breach of contract claim requires proof of damages, and Young's complaint leaves some uncertainty about the nature of the damages she seeks in Count I. But defendants do not

### 2. Count II

Although Count II purports to allege a separate contract claim, its allegations almost entirely duplicate those pled in Count I. The only distinction between Counts I and II is that the latter seeks a declaration that Wells Fargo is in violation of the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654, and the Helping Families Save Their Homes Act of 2009 ("the Helping Families Act"), Pub. L. No. 111-22, 123 Stat. 1632. The parties agree that these citations intend to reference HAMP and that Count II relies, at least in part, on defendants' alleged violations of HAMP.[9]

---

argue that the pleading is insufficient as to this element of Young's contract claim and we thus offer no opinion on the question of damages. The question will, however, be important at later stages of the case.

[9] We wish to clarify the relationship between these statutes and HAMP. HERA, passed in 2008 before EESA, was designed to aid families facing foreclosure. Among other measures, it created the Hope for Homeowners Program ("H4H"). H4H encourages lenders to offer borrowers modified mortgages with a lengthier repayment period and provides that the Federal Housing Administration will insure these modified mortgages. See § 1402, Pub. L. No. 110-289, 122 Stat. 2654. HERA also enacted a number of amendments to the Truth in Lending Act that require the Secretary of the Treasury "to take advantage of [H4H] or other available programs to minimize foreclosures." 12 U.S.C. § 5219(a)(1) (emphasis added).
The Helping Families Act, signed into law in May 2009, enacted an array of measures to reduce foreclosures and preserve homeownership. The Act contains Congressional findings that "servicers must be given . . . authorization to modify mortgage loans and engage in other loss mitigation activities consistent with applicable guidelines." § 201(a)(2), Pub. L. No. 111-22, 123 Stat. 1632, 1638; see also Markle, 844 F. Supp. 2d at 184 ("To forestall the impact of the crisis and stabilize property values, Congress concluded that mortgage servicers must be authorized to

Count II is confusing, vague, and, most importantly, does not plead a claim for relief distinct from Count I.[10]  In fact, Young expressly disavows any wish to plead a cause of action directly under HAMP.  Instead, she says that Count II arises "under . . . the parties' contract," the contract being the TPP.  Defendants' alleged HAMP violations, she asserts, merely "provide[] background information" useful to interpreting her contract claim.  Accepting Young's characterization of her own claim, Count II merely duplicates Count I, which also asserts a cause of action for breach of the TPP.  That HAMP and its attendant guidelines may be helpful in interpreting the contract does not change the fact that through Count II, Young seeks the "enforcement of a contract

modify loans consistent with, among other EESA-authorized initiatives, the HAMP guidelines and objectives.") (citation omitted).

Plaintiffs in some jurisdictions have argued that the Helping Families Act and HERA impose an affirmative duty on mortgagees and loan servicers to offer loan modifications to eligible borrowers using programs such as HAMP.  See, e.g., Hart v. Countrywide Home Loans, Inc., 735 F. Supp. 2d 741, 747-48 (E.D. Mich. 2010).  Although Young does not frame her arguments in precisely this manner, the parties agree that the references to these statutes should be read as alleging violations of HAMP.  We therefore address them as such.

[10] Count II seems to request declaratory relief under the statutes that created HAMP.  The district court construed Count II as an attempt to assert a cause of action arising directly under those statutes, and dismissed the claim because those laws do not confer a private right of action.  See Wigod, 673 F.3d at 559 n.4 ("[S]ome homeowners [have] tried to assert rights arising under HAMP itself.  Courts have uniformly rejected these claims because HAMP does not create a private federal right of action for borrowers against servicers.").  Young does not challenge this conclusion on appeal and we do not pass upon its merits.

-22-

between the parties," as she acknowledges. Count I already serves that purpose. Pleading an additional cause of action provides her with no further remedy. Count II is therefore subject to dismissal as a duplicative claim. See Swartz v. KPMG LLP, 476 F.3d 756, 766 (9th Cir. 2007) (holding that "[t]o the extent Swartz seeks a declaration of defendants' liability for damages sought for his other causes of action," claim must be dismissed as "merely duplicative"); Ferran v. Town of Nassau, 11 F.3d 21, 23 (2d Cir. 1993) (holding that because § 1985 claim "merely duplicates part of their claim under § 1983," dismissal of former claim was "appropriate because the claim is unnecessary").[11]

We clarify that this conclusion does not render HAMP and its attendant guidelines irrelevant to this litigation.[12] Since Young has successfully pled a breach of contract claim under Count I, the district court at a later stage may look to extrinsic evidence in order to resolve any ambiguities in the TPP. The

---

[11] Although defendants have not pressed this particular argument on appeal, we may affirm on any basis apparent in the record. Cook v. Gates, 528 F.3d 42, 48 (1st Cir. 2008); see also Jordan v. U.S. Dep't of Justice, 668 F.3d 1188, 1200 (10th Cir. 2011) ("We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal.") (citation omitted) (internal quotation marks omitted).

[12] Since HAMP's inception, the Treasury Department has issued a series of guidelines to loan servicers that provide directives and advice about effectuating their obligations under the program. See Home Affordable Modification Program: Overview, https://www.hmpadmin.com/portal/programs/hamp.jsp (last visited Apr. 29, 2013).

statutes that created HAMP, as well as the Treasury Department's guidelines to mortgage servicers on how to apply HAMP, may be helpful in this endeavor.  See Lass v. Bank of Am., N.A., 695 F.3d 129, 136-37 (1st Cir. 2012) (looking to background federal regulatory scheme in order to interpret ambiguous contract terms); Cady v. Marcella, 729 N.E.2d 1125, 1129-30 (Mass. App. Ct. 2000) (stating that contract should be "construed . . . in a reasonable and practical way, consistent with its language, background, and purpose") (citation omitted) (internal quotation marks omitted).[13]

Accepting Young's characterization of her own complaint, we dismiss Count II as duplicative.

## B.  Breach of the Covenant of Good Faith and Fair Dealing

Under Massachusetts law, "'[e]very contract implies good faith and fair dealing between the parties to it.'"  T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 703-04 (Mass. 2010) (quoting Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991)).  The covenant of good faith and fair dealing requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract."  Id. at 704 (citation omitted) (internal quotation marks omitted).

---

[13] Because we affirm the dismissal of Count II, we need not address defendants' contention that "Young cannot characterize her HAMP claim as a common law breach of contract claim to overcome the fact that no private right of action exists under HAMP."

-24-

In order to prevail, the plaintiff must "present[] evidence of bad faith or an absence of good faith." Id. at 706; see also id. at 704 ("There is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith."); Liss v. Studeny, 879 N.E.2d 676, 680 n.3 (Mass. 2008) (same). Lack of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will." Hartford Accident & Indem. Co. v. Millis Roofing & Sheet Metal, Inc., 418 N.E.2d 645, 647 (Mass. App. Ct. 1981). Evidence that a party behaved in a manner "unreasonable under all the circumstances" may indicate a lack of good faith, Nile v. Nile, 734 N.E.2d 1153, 1160 (Mass. 2000), but the core question remains whether the alleged conduct was motivated by a desire to gain an unfair advantage, or otherwise had the effect of injuring the other party's rights to the fruits of the contract. Compare id. (finding lack of good faith where defendant's conduct destroyed party's right to fruits of agreement), with T.W. Nickerson, 924 N.E.2d at 707 (holding that there was no breach of implied covenant when "plaintiff presented no evidence that [the defendant] terminated the trust in order to gain an advantage for itself").

The concept of good faith "is shaped by the nature of the contractual relationship from which the implied covenant derives," and the "scope of the covenant is only as broad as the contract

-25-

that governs the particular relationship."  Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005).  As a consequence, the implied covenant cannot "create rights and duties not otherwise provided for in the existing contractual relationship," and instead focuses on "the manner of performance."  Id. (internal citation omitted) (quotation marks omitted); see also Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005) ("The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance.").

Young's implied covenant claim incorporates the allegations in her breach of contract claims, and focuses on defendants' mishandling of her loan modification process at the end of her trial period and thereafter.  As noted, rather than sending Young a permanent modification offer, Wells Fargo sent her a form letter in January 2010 wrongly stating that she was ineligible for a permanent modification because she had failed to make timely trial period payments.  Only after her counsel got involved did Wells Fargo admit its error.  Even then, it took the bank another five months of communications and phone calls from both Young and her lawyer before Young finally received the promised permanent modification agreement in June 2010.

-26-

Wells Fargo "could certainly have been more diligent in its monitoring . . . with respect to [Young]," Shawmut Bank, N.A. v. Wayman, 606 N.E.2d 925, 928 (Mass. App. Ct. 1993). The bank's dilatory and careless conduct is troubling. We also find it problematic that Young required the aid of counsel to obtain clear answers from Wells Fargo representatives about the status of her loan modification, suggesting that defendants would not have responded to her without a lawyer's intervention. But the allegations that the bank acted to correct its initial errors, and eventually sent Young a permanent modification agreement, paint a picture of an unthinking and sloppy institution, rather than one that acted with an improper purpose. Also, the allegations in the complaint describing the bank's dilatory conduct, while supporting a breach of the contract, do not describe conduct that deprived her of the contract's fruits. Indeed, the complaint alleges that she eventually received a permanent modification agreement that, if executed, would have prevented her foreclosure and allowed her to reduce her monthly mortgage payments. Insofar as Young objects to the permanent modification's increase in payments from the TPP, we have already explained that the TPP expressly permits such an increase.[14] In sum, Young's complaint fails to plead that defendants' behavior was motivated by a desire to gain an unfair

---

[14] Echoing our disposition of Count I, Young has waived any argument that defendants breached the implied covenant by unfairly calculating Young's permanent modification payments.

-27-

advantage or had the effect of injuring her ability to obtain the contract's fruits.

To be clear, there may be circumstances in which an unreasonable delay in performance or sustained inattention would give rise to an implied covenant claim under Massachusetts law. See, e.g., Frostar Corp. v. Malloy, 823 N.E.2d 417, 427 (Mass. App. Ct. 2005). Nor do we accept defendants' argument that a showing of bad faith depends on alleged misconduct amounting to fraud, as the Massachusetts courts have made clear that a lack of bad faith may be demonstrated in a variety of ways. Cf. McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 301 (1st Cir. 2004) (rejecting argument that only "'arbitrary and capricious' use of discretion" could support implied covenant claim, and observing that "Massachusetts courts have [] used the language of 'unreasonableness'") (citation omitted). Our disposition of Young's implied covenant claim is simply controlled, as it must be, by the specifics of Young's allegations.

## C. Negligent and Intentional Infliction of Emotional Distress

Under a single count of the complaint, Young pleads two separate claims for negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED"). These claims rely in part on her interactions with Wells Fargo as respects the TPP and her permanent loan modification, but they also

encompass her allegations regarding the bank's handling of her account before she entered into the TPP.

Regarding Young's NIED claim, it is axiomatic that duty is a necessary ingredient of an action for negligence. See Glidden v. Maglio, 722 N.E.2d 971, 973 (Mass. 2000). Here, the district court rested its dismissal of the negligence claim entirely on the nonexistence of a tort duty. Despite this rationale, Young's opening brief fails to address the question of duty at all and her reply gives the issue only perfunctory treatment.[15] We have repeatedly held, "with a regularity bordering on the monotonous," that arguments not raised in an opening brief are waived. Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000); see also Brandt v. Wand Partners, 242 F.3d 6, 17 (1st Cir. 2001). Accordingly, we affirm the dismissal of her NIED claim.

To make out an IIED claim under Massachusetts law, Young must demonstrate that Wells Fargo "(1) intended to inflict emotional distress by (2) undertaking actions that were extreme and outrageous, thereby (3) causing emotional distress which (4) was severe." Flibotte v. Pa. Truck Lines, Inc., 131 F.3d 21, 27 (1st

---

[15] Young asserts in reply that the district court "did not establish any specific grounds for dismissal of the Emotional Distress Count based on a duty of care." This characterization is belied by the district court's handling of this count, which refers back to its earlier discussion of duty in its opinion and order. The court's order also cites a case for the proposition that a lender does not owe a borrower a duty of care. See Corcoran v. Saxon Mortg. Servs., Inc., No. 09-11468-NMG, 2010 WL 2106179, at *4 (D. Mass. May 24, 2010).

Cir. 1997). Extreme and outrageous conduct is behavior that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987) (citation omitted) (internal quotation marks omitted).

Here, the complaint pleads that Young was "emotionally devastated" by her dealings with defendants and that she suffered from anxiety and loss of sleep. She also indicates that the problems with her mortgage strained her family relationships to a severe degree. Without minimizing the significance of these allegations, the complaint alleges no facts showing that Wells Fargo acted with the requisite intent or that the inconvenience and agitation Young endured rose to such a level that "no reasonable [person] could be expected to endure it." Limone v. United States, 579 F.3d 79, 94 (1st Cir. 2009) (quoting Agis v. Howard Johnson Co., 355 N.E.2d 315, 318-19 (Mass. 1976)). We therefore affirm the district court as to Young's emotional distress claims.

## D. Unfair Debt Collection Practices Under Chapter 93A

Young also pleads a claim under Mass. Gen. Laws ch. 93A, otherwise known as Chapter 93A. This statute "provides a cause of action for a plaintiff who 'has been injured,' by 'unfair or deceptive acts or practices.'" Rule v. Fort Dodge Animal Health, Inc., 607 F.3d 250, 253 (1st Cir. 2010) (quoting Mass. Gen. Laws

ch. 93A, §§ 2(a), 9(1)). The Massachusetts courts have explained that "[a] practice is unfair if it is within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury." Linkage Corp. v. Trs. of Boston Univ., 679 N.E.2d 191, 209 (Mass. 1997) (citation omitted) (internal quotation marks omitted) (modifications omitted). Violation of a statute is not a necessary element of a Chapter 93A claim, as the consumer protection law "creates new substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute." Commonwealth v. Fremont Inv. & Loan, 897 N.E.2d 548, 556 (Mass. 2008) (internal citation omitted) (quotation marks omitted). Nor is liability under Chapter 93A precluded by the absence of a contractual breach. See NASCO, Inc. v. Public Storage, Inc., 127 F.3d 148, 152 (1st Cir. 1997).

Like her emotional distress claims, Young's Chapter 93A claim extends beyond the alleged breaches of the TPP and includes defendants' handling of her entire case, beginning with the negotiations surrounding her forbearance agreement through her attempts to obtain a permanent loan modification. On appeal, defendants do not attempt to say that their conduct was not an unfair trade practice; the only issue presented on appeal is whether Young sufficiently pled that she suffered damages as a

result of defendants' alleged violations.[16]  Case law on the types of damages that are cognizable under Chapter 93A continues to evolve.  In <u>Rule</u>, we surveyed recent Massachusetts Supreme Judicial Court opinions addressing the definition of "injury" under Chapter 93A, and observed that "the more recent SJC cases . . . appear to have returned to the notion that injury under chapter 93A means economic injury in the traditional sense."  607 F.3d at 255.  We acknowledged, however, that there may remain certain exceptions to this general rule, embodied in older SJC opinions that have not been overruled.  <u>Id.</u> (citing <u>Leardi</u> v. <u>Brown</u>, 474 N.E.2d 1094, 1098 (Mass. 1985)); <u>see also</u> <u>Hershenow</u> v. <u>Enterprise Rent-A-Car Co. of Boston, Inc.</u>, 840 N.E.2d 526, 534-35 (Mass. 2006) (noting that plaintiffs had failed to prove that unlawful conduct caused them

---

[16] Defendants note that Young's opposition below focused on whether Wells Fargo's status as a trustee rendered it immune from Chapter 93A liability, and suggest that her argument on appeal was not properly articulated to the district court, rendering it waived.  This is not so.  For one, defendants gloss over the fact that Young focused on the trustee issue below only because it was one of defendants' main arguments in support of dismissing this claim.  Defendants contended that Wells Fargo was acting in a "principally private function," and was thus not engaged in trade or commerce for the purposes of Chapter 93A.  The district court did not adopt this particular argument and defendants have not pressed it before us.  On appeal, Young cannot be blamed for not addressing an issue that was not part of the district court's opinion, and that defendants themselves have dropped.  More fundamentally, Young's opening brief discusses the complaint's Chapter 93A allegations and argues for their legal sufficiency.  This is the core of her burden under Rule 12(b)(6) and is sufficient to bring her Chapter 93A claim before us.

damages when they did not "experience[] any other claimed economic or noneconomic loss").

Here, we need not delineate the outer boundaries of what constitutes "injury" under Chapter 93A, because Young's complaint sufficiently alleges that she experienced economic damages as a result of defendants' conduct. Paragraph 85 of the complaint states that

> [b]ecause of the above described actions of [defendants], the Plaintiff has suffered money damages, including, but not necessarily limited to: (i) The Potential Loss of any and all equity she has built up in the home during the time she made payments; (ii) damage to her credit rating and her ability to obtain loans or credit in the future, and; (iii) an increase in interest rates she will have to pay on any existing or future loans and credit card accounts.

Although defendants assert that this allegation is too speculative to support Young's claim, that argument fails. As noted, the Chapter 93A claim encompasses conduct long preceding Young's execution of the TPP with Wells Fargo. This conduct dates back to August 2008, when defendants mistakenly posted a notice on her door stating that she was in arrears on her mortgage payments, and continued to supply her with misinformation about her obligations under the mortgage. Defendants' handling of her loan modification process under the TPP was only the culmination of a prolonged period of unfair conduct.

Drawing all inferences in Young's favor, the complaint alleges that Wells Fargo's repeated mistakes during the forbearance and loan modification process subjected her to loss of equity in her home and damage to her credit ratings. The consequences of this conduct plausibly placed Young "in a worse and [more] untenable position than [she] would have been" had defendants dealt with her appropriately during this period of time. Hershenow, 840 N.E.2d at 534. She accordingly incurred economic damages that adversely affect her now and will continue to affect her in the future. See Stagikas v. Saxon Mortg. Servs., Inc., 795 F. Supp. 2d 129, 137 (D. Mass. 2011) ("The complaint also alleges several injuries resulting from defendant's allegedly deceptive representations about plaintiff's HAMP eligibility, including increased interest on the debt, a negative impact on plaintiff's credit history, and the loss of other economic benefits of the loan modification. That is enough to sustain a claim of injury under chapter 93A." (internal citation omitted)); compare Rule, 607 F.3d at 255 (upholding dismissal of Chapter 93A claim where plaintiff "neither holds nor sold anything of reduced value, faced no continuing risk and suffered no harm").[17]

---

[17] In her reply brief, Young notes that Chapter 93A permits a plaintiff to recover damages for severe emotional distress of the type that would give rise to an IIED claim. See Haddad v. Gonzalez, 576 N.E.2d 658, 667-68 (Mass. 1991). Because we conclude that Young has alleged economic injury sufficient to state a Chapter 93A claim, and because this argument was raised only cursorily in reply, we do not address its merits.

At this stage of the proceedings, where Young need allege "only enough facts to make the claim plausible," Liu v. Amerco, 677 F.3d 489, 497 (1st Cir. 2012), she has done enough to survive dismissal.

**E.  Equitable Relief**

The final count of Young's complaint requests equitable relief and seeks, inter alia, a permanent injunction forbidding defendants from removing her from her home.  The parties agree that this claim is derivative of Young's other causes of action, and the district court's dismissal of this count was predicated entirely on its dismissal of Young's other claims.  As we vacate the district court's order as to her breach of contract claim under Count I and her Chapter 93A claim, we similarly vacate its order on her claim for equitable relief.

### III.

For the reasons stated, we affirm the district court's dismissal of Young's breach of contract claim under Count II, her breach of the implied covenant claim under Count III, and her negligent and intentional infliction of emotional distress claim under Count IV.  We vacate the dismissal of her breach of contract claim under Count I, her Chapter 93A claim under Count V, and her derivative claim for equitable relief under Count VI.  We remand to the district court for further proceedings consistent with this opinion.  The parties are to bear their own costs.

**So ordered.**