**Ellery G. PENNINGTON; Laura M. Pennington; Traci Smith, Plaintiffs–Appellants,**

v.

**HSBC BANK USA, N.A.; Wells Fargo Bank, N.A., Wells Fargo Home Mortgage, Defendants–Appellees.**

No. 12–50064.

United States Court of Appeals, Fifth Circuit.

Oct. 3, 2012.

James Patrick Sutton, Austin, TX, for Plaintiffs–Appellants.

William Scott Hastings, Esq., Daron L. Janis, Esq., Robert Thompson Mowrey, Locke Lord, L.L.P., Dallas, TX, Benjamin David Lee Foster, Esq., Amanda M. Schaeffer, Attorney, Locke Lord, L.L.P., Austin, TX, for Defendants–Appellees.

Before KING, SMITH, and HIGGINSON, Circuit Judges.

JERRY E. SMITH, Circuit Judge: [*]

Ellery and Laura Pennington (jointly) and Traci Smith sued HSBC Bank USA, N.A., and Wells Fargo Bank, N.A. (jointly, "the bank"), in state court, alleging various state-law claims including breach of contract and negligent misrepresentation and violation of the Texas Constitution and Texas Deceptive Trade Practices Act; plaintiffs sought injunctive relief to forestall foreclosures. The banks removed to federal court based on diversity of citizenship. The district court granted the bank's motion to dismiss, and we affirm.

I.

The Penningtons took out a home equity loan in 2004. In 2009, after Ellery Pennington lost his job, they sought a loan modification to reduce their monthly payments. The bank identified the Penningtons as candidates for the federal Home Affordable Modification Program ("HAMP") and sent them, as Step One in the HAMP documentation process, a Trial Period Plan ("TPP") offer, which set out a schedule of three payments as one of the conditions to obtaining a loan modification. The TPP also required the Penningtons to certify that they were unable to afford their current mortgage payments.

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

The scheduled payments set by the TPP were less than the payments required to cover all the interest and principal owed on the home equity loan with each installment. After paying ten trial payments without being offered a loan modification, during which the bank kept separate accounts for the interest due under the original note and applied late charges,[1] the Penningtons were told that because of the Texas Cash Out Policy—which prohibited modifying a loan if the amount owed exceeds the original amount borrowed—they could not obtain a modification.

Smith was not late or behind on payments but just wanted to reduce her payments. The bank had her stop making her usual payments and instead make trial payments under the TPP starting in September 2010. In January 2011, the bank told her on the phone that she would be approved for the second step of the HAMP documentation process, termed Step Two. In February 2011, the bank sent her a letter congratulating her and giving her the Step Two document, which included a loan modification agreement. In May 2011, the bank told Smith that she would not receive a loan modification; the bank's representative said there was nothing he could do, because the bank would be breaking the law by modifying the loan. Smith alleges that if she had never entered the loan modification process, she would not have missed a payment.

Plaintiffs allege that the TPP violated Section 50(a)(6) of the Texas Constitution, which includes homestead protections prohibiting forced sales except for certain qualifying extensions of credit.[2] They also claim the bank breached their TPP contracts by failing to give them loan modifications and that the bank is liable for negligent misrepresentation for suggesting that HAMP loan modifications are legal in Texas when in fact they are not. Finally, Smith argues that the bank is estopped from providing any basis for declining to give her a loan modification other than perceived illegality, so if the modification is legal, it should be granted.

## II.

■ Although plaintiffs contend that their TPPs violate Texas constitutional provisions never previously addressed by this court, we need not determine whether the TPP constitutes a loan modification or whether such a modification means the loans no longer comply with Section 50(a)(6), because the plaintiffs failed to satisfy the conditions of the TPP and, in the case of Smith, her Modification Agreement. No one disputes that their initial home equity loans met Section 50(a)(6)'s requirements. Thus, the loans can violate that section now only if they were modified by the TPP or the Step Two Modification Agreement. Regardless of whether the TPP modifies a loan when a borrower meets his obligations, it does not modify a loan when he fails to meet the conditions the TPP specifies are necessary to obtain a modification.[3]

---

1. The complaint does not detail the exact amount of late charges compared to other penalties, but the timeline attached to the complaint as Exhibit 1 states that on July 22, 2010, a woman at Wells Fargo said that to get out of the foreclosure process, the Penningtons would need to pay all late payments and penalties, totaling $21,477.39.

2. Section 50(a)(6) provides, "The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for ... an extension of credit that [meets numerous requirements]."

3. The TPP states,

I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a

The plaintiffs claim the bank breached the TPP by failing to offer them the Step Two Permanent Loan Modification. Smith also argues that the bank breached the Step Two Modification Agreement she signed by not changing the terms of her loan. To succeed on a breach-of-contract claim, Smith must show "(1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages." *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex.App.-Fort Worth 2010, no pet.) (internal quotation marks omitted). A valid contract in Texas requires (1) an offer; (2) acceptance in strict compliance with the offer's terms; (3) meeting of the minds; (4) each party's consent to the terms; (5) the contract to be executed and delivered with intent that it be mutual and binding; and (6) consideration. *Id.* at 670.

Whether the TPP itself is a contract, and what obligations it imposes, are questions of first impression in this circuit. Courts have proposed a wide variety of answers to whether the TPP is a contract requiring the lender to provide a permanent modification under HAMP even to a borrower who complies with the TPP requirements. Some courts have used general reasoning to resolve the issue for all TPPs at once, attacking the plan for lack of consideration or definite terms or as being an attempted end-run around HAMP's lack of a private cause of action. Courts finding no consideration reason that all the terms are either required by the initial loan (i.e. regular payments) or are best understood as conditions of applying for the HAMP program. *E.g., Senter v. JPMorgan Chase Bank, N.A.*, 810 F.Supp.2d 1339, 1348–49 (S.D.Fla.2011).

Other courts have decided that the additional terms in the TPP constitute consideration, namely opening new escrow accounts, undergoing credit counseling if asked, and proving financial information. *E.g., Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 564 (7th Cir.2012). A few courts have declared that state breach-of-contract claims fail to state a cause of action independently of HAMP. *E.g., Bourdelais v. J.P. Morgan Chase*, No. 3:10–CV–670–HEH, 2011 WL 1306311, at *4 (E.D.Va. Apr. 1, 2011). Because HAMP affords no private right of action, *Miller v. Chase Home Fin., LLC*, 677 F.3d

---

fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed.

Even if that were not clear enough on its own, the TPP also states,

> I agree to the following.... That all terms and provisions of the Loan Documents remain in full force and effect: nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents.

The plain language of the TPP demonstrates that the initial trial period does not modify the loan.

Instead of constituting a modification, as the Plaintiffs argue, the initial payments operate as a forbearance agreement that is to be in effect until the lender decides whether it will grant a modification under HAMP. According to the eligibility criteria in the plan, the plaintiffs certify, represent to the lender and agree ... I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have access to sufficient liquid assets to make monthly mortgage payments now or in the near future.

A borrower eligible for Step One has certified that he will fall behind on payments. Thus, beginning initial payments under the TPP is not a "foreclosure trap," nor an installment of a balloon payment contrary to the purpose of Section 50, *see Cerda v. 2004–EQR1 L.L.C.*, 612 F.3d 781, 790–91 (5th Cir.2010); it allows those who know they cannot make their loan payments to avoid foreclosure while seeking a way to salvage their financial circumstances.

1113, 1116 (11th Cir.2012), the *Bourdelais* court's reasoning means dismissal of a claim.

Various courts have more narrowly addressed whether particular TPPs required lenders to offer a permanent modification, regardless of whether a TPP in general is a contract. Some of those courts have determined that the TPP does not require a lender to offer a permanent loan unless the plaintiff alleges that the lender determined that the plaintiff met the requirements of the TPP or provides evidence of a loan modification with a new monthly payment that both lender and borrower agreed to in executed loan documents. *E.g., Lonberg v. Freddie Mac*, 776 F.Supp.2d 1202, 1210 (D.Or.2011). Other courts have found that the TPP is not effective unless

> after [the borrower] sign[s] and return[s] two copies of this Plan to the Lender, the Lender [sends] [the borrower] a signed copy of this Plan if [the borrower] qualif[ies] for the Offer or [sends] [the borrower] written notice that [the borrower] does not qualify for the Offer. This plan will not take effect unless and until both [the borrower] and the lender sign it and Lender provides [the borrower] with a copy of this Plan with the Lender's signature.

*Soin v. Fed. Nat'l Mortg. Ass'n*, No. 2:12–634, 2012 WL 1232324, at *5 (E.D.Cal. Apr. 12, 2012) (analyzing contractual language that matches the TPP in the instant case).

### III.

We review the grant of a motion to dismiss *de novo*, accepting all well-pleaded facts as true, viewed in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.2007). We need not determine whether TPPs in general are contracts, because these plaintiffs have not met the conditions set by the TPPs and Modification Agreements. Smith's allegations demonstrate her financial disqualification from the program; the bank never signed the TPP for the Penningtons or the Modification Agreement for Smith, which is required for the provisions to take effect.

### A.

 By Smith's own pleadings, she was ineligible for a HAMP loan modification, because she cannot meet the financial-hardship requirement.[4] Section 1 of the TPP requires that the borrower be unable to make the monthly payments "now or in the near future." Yet, Smith insists, "[h]ad Smith never entered the loan modification process and acquiesced to [the bank's] demand that she quit making her regular monthly payments, she would never have missed a payment at all."

None of the facts Smith pleaded supports eligibility. In the light most favorable to Smith, her assertion that she would not have fallen behind absent HAMP shows she was ineligible for the loan modification.

The TPP and Modification Agreement include a continuing obligation to satisfy the financial-eligibility requirements. Section 2(F)(i) of the TPP says that the TPP terminates if the Lender does not provide a fully executed copy of the Plan and Modification Agreement.[5] The beginning of the TPP states that, "[i]f ... my representations in Section 1 continue to be true

---

4. "Because th[is] appeal[ ] is from dismissal[ ] on the action['s] pleadings, we must assume the allegations are true and describe them as if they were fact." *Little v. KPMG LLP*, 575 F.3d 533, 535 (5th Cir.2009).

5. "If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement ... the Loan Documents will not be modified and this Plan will terminate."

in all material respects, then the Lender will provide me with a Loan Modification Agreement." Furthermore, effecting the Modification Agreement is contingent on the financial-hardship representations continuing to be true.[6] Combined, these show that if the financial-hardship representations are ever not true, the lender does not have to give an effected modification agreement to the borrower, and if that does not happen, the TPP terminates. Thus, if the borrower no longer meets the criteria in Section 1 before the Modification Effective Date, his TPP will terminate, and he will be unable to receive a loan modification.[7] Because financial eligibility is a condition for the TPP, Smith is not entitled to any benefits the TPP might provide.

## B.

██ The Penningtons' claim for breach of the TPP fails for an even more basic reason: Their TPP did not form a contract, because the bank never expressed an intent to be bound.[8] The TPP expressly requires that before the contract is final, the lender must send a signed copy to the borrower. The Penningtons never alleged that they received such a signed copy. Their contract contained the same language as in *Soin*, 2012 WL 1232324, at \*5, that the TPP does not take effect until the borrower and the lender sign it and the lender provides the borrower a signed copy. Just as with the borrower in that case, the Penningtons made regular TPP payments, but they neither produced such a signed contract nor allege such a signed contract exists.

The Penningtons, unlike Smith, also admit that the bank did not send them a contract saying they were approved to move on to Step Two. Whenever they checked the status of their application, they were told it was "in review." The complaint therefore does not demonstrate that the Penningtons' TPP ever took effect, so there could be no contract for the bank to breach.

The above reading of the TPP, supported by *Soin*, is further bolstered by the fact that Texas courts give significant weight to express requirements that contracts be executed by the parties before they become binding.[9] When deciding

---

6. Section 2(B) of the Modification Agreement expressly states that "the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement." And, the second paragraph is clear that effectuation of the Modification Agreement is contingent on the representations regarding financial hardship "continu[ing] to be true in all material respects."

7. Because the language of the agreement requires that a borrower continue to satisfy the financial hardship requirements in order to receive a loan modification, we decline to follow *Wigod*, 673 F.3d at 562, to the extent it permits a lender to check whether the borrower's income qualified him for financial hardship only before the TPP is signed.

8. Despite the bank's assertion to the contrary, plaintiffs' brief does indicate that they appeal the rejection of the Penningtons' breach-of-

contract claim. The brief merely states, "There is no allegation that the Penningtons ever received the 'Step Two,' but rather than [*sic* ] [the bank] was obligated to provide it once the Penningtons satisfied all the conditions of 'Step One.'" The general arguments at the beginning of the section also discuss how some courts consider the TPP a contract, while others do not based on lack of consideration, but that they believe they have shown adequate consideration. Although the brief does not set forth a thoroughly explored argument, it does indicate that the Penningtons believe the TPP was a contract entitling them to receive the Step Two Permanent Loan Modification.

9. *See, e.g., RHS Interests, Inc. v. 2727 Kirby Ltd.*, 994 S.W.2d 895, 897–99 (Tex.App.-Houston [1st. Dist.] 1999, no pet.) (construing a document that specifically was not binding until a contract was signed and permitted inspection of the property before signing as

whether parties intended to be bound by the statements in a document, courts examine how plainly the document indicates it is meant to be non-binding. Provisions expressly requiring the agreement be executed before it binds the parties are considered particularly significant.[10]

Although the bank's acceptance of the trial payments from the Penningtons lends some support to finding that the parties intended to be bound,[11] that weight is reduced, because the Penningtons already owed regular payments. Although the fact that they paid under the TPP indicates that they hoped to be bound, the question is whether the bank expressed a similar intent despite the fact that conditions in the TPP remained unfulfilled. The bank deposited the payments, but the Penningtons owed more than that. Even if the bank intended to refuse to accept the TPP, it would still take the money in partial satisfaction of the amount owed while interest accrued.

## C.

■ Smith's claim for a breach of the Modification Agreement fails for the same

reason the Penningtons' claim under their TPP does: A breach-of-contract claim cannot succeed absent a binding contract. Smith argues that because the bank would have signed but for its perception that the loan modification was illegal, if the modification is in fact legal we should consider the bank to have signed the loan modification to give effect to the parties' "manifest mutual assent."

The lack of a signature from the bank indicates that it did not intend to be bound by the Modification Agreement. The Step Two agreement states, "This agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied." Section 2(B) explains that the Loan Documents will not be modified unless and until "the Lender accepts this Agreement by signing and returning a copy of it to me." The Step Two agreement specifies that the bank is accepting the agreement by signing it, so its signature is an expression of its intent to be bound. Considering the explicit signature requirements of the Step Two Agreement, there was no Modification Agreement without the bank's signature.[12]

---

non-binding, because the language of the document showed "[a] deal would be consummated only by 'the execution of the binding Purchase and Sale Agreement.' "); *Coastal Corp. v. Atl. Richfield Co.*, 852 S.W.2d 714, 717 (Tex.App.-Corpus Christi 1993, no writ) (enumerating among the reasons there was no valid contract, that "[w]hile all of the parties do concede that they reached agreement on particular issues, it is clear that the owners did not consider themselves to have a contract. The document memorializing the agreement expressly required that it be executed.... No owner has admitted executing a contract with Coastal."); *see also John Wood Grp. USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 17 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (comparing cases and determining that case was more like those in which no contract was formed, because "the language of the letter agreements specifically stated that the

agreements would not be binding until further actions took place.").

**10.** *John Wood Grp. USA, Inc.*, 26 S.W.3d at 17 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (citing two cases that mention the significance of the fact that the contracts expressly required execution).

**11.** *See Murphy v. Seabarge*, 868 S.W.2d 929, 933 (Tex.App.-Houston [14th Dist.] 1994) (finding that a partner beginning to pay himself according to a contract that claimed it was not binding on the parties created a fact issue as to whether he intended to be bound).

**12.** Step Two also requires the same financial qualifications that Smith's complaint contends she failed to meet, so her breach-of-contract claim for the Modification Agreement also fails for the same reason her breach-of-contract claim for the TPP does.

## IV.

The plaintiffs allege that the bank negligently misrepresented "that a modification was *legal.*" The elements of negligent misrepresentation are that

(1) the representation is made by a defendant in the course of its business, or in a transaction in which it has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*E.R. Dupuis Concrete Co. v. Penn Mut. Life Ins. Co.*, 137 S.W.3d 311, 321 (Tex. App.-Beaumont 2004, no pet).

■ Assuming without deciding elements one through three are met, the plaintiffs cannot satisfy the fourth: interest and fees that accrued while the plaintiffs were following the TPP did not arise because of the TPP. As a prerequisite of entering the TPP, plaintiffs certified that they were unable to continue making their monthly payments. If they truly were unable to make the payments, they still would have fallen behind, accrued interest, suffered late charges, and owed addition payments on that interest. If the plaintiffs were able to make all their payments as they came due, they would have been ineligible for the HAMP program for lacking the requisite hardship and would have been rejected from Step Two—landing them in the same predicament they face now.[13] Accrual of unpaid interest was a foregone conclusion, not a result of negligent misrepresentation.

## V.

Smith claims that the bank is bound by promissory estoppel to modify her loan, if doing so is legal, basing the claim on the bank's telling her she would get the loan modification and then later refusing because doing so was illegal. The elements of promissory estoppel are (1) a promise; (2) foreseeability of reliance thereon by the promissor, and (3) substantial reliance by the promisee to his detriment. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983).

■ First, there were no promises on which Smith was entitled to rely. Even the statement from the bank in January that she would be approved was still subject to maintaining the requirements of the TPP, including her inability to make her payments on the loan; it was not an absolute guarantee. Her reliance is especially improper, because she could make those payments and thus should have known she would not receive a loan modification. Until the modification is executed and the Modification Effective Date arrives, loan modification will fail to occur if the borrower ceases to meet the requirements of Section 1 in the TPP.

■ Second, though Smith may have reliance damages, she, by insisting they equal the money she spent renovating her house and her TPP payments, she fails to allege any damages that satisfy the reliance requirement. The bank could not foresee that Smith would spend money

---

13. It may be possible for a plaintiff to suffer damages from the TPP if he was unable to make his regular payments, but absent the TPP he would have paid more than the monthly trial payment. Then, the damages would be interest he had to pay beyond what he would have had to pay if he had made their higher-but-still-incomplete payments (likely a very small amount if anything). Plaintiffs have not alleged that they would have made payments above the TPP yet below the full amount, and they have not pleaded any facts from which such a situation can be inferred, so they have not alleged any pecuniary damages that resulted from a Wells Fargo representation that the TPP was legal.

renovating her house after believing she would receive a loan modification. The HAMP program is for those in dire financial straits. The bank would not expect that a borrower in the program would have enough cash on hand to begin spending it on home renovations. Nor do the TPP payments constitute detrimental reliance because they were just applied to the loan. As the *Wigod* court noted, 673 F.3d at 566, the detriment suffered is the lost opportunity to alleviate ones home-equity indebtedness more significantly by foregoing utilizing another remedy, bankruptcy. Smith, however, has not alleged any alternative course of action she would have taken, except for never falling behind, which prevents her from relying on promissory estoppel in any event.

The judgment of dismissal is AFFIRMED.

---

* Pursuant to 5TH CIR R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.