**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────────

**No. 15-1998**

─────────────────

JAY NEIL; ERIKA K. NEIL,

     Plaintiffs − Appellants,

   v.

WELLS FARGO BANK, N.A., d/b/a Wells Fargo Home Mortgage; BWW LAW
GROUP, LLC; EQUITY TRUSTEES, LLC,

     Defendants – Appellees,

   and

BANC OF AMERICA FUNDING CORP., 2005−4 TRUST,

     Defendant.

─────────────────

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Claude M. Hilton, Senior District Judge.  (1:13−cv−00644−CMH−JFA)

─────────────────

Argued:  December 8, 2016      Decided:  April 27, 2017

─────────────────

Before MOTZ and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

─────────────────

Affirmed by unpublished opinion.  Judge Diaz wrote the majority opinion, in which
Judge Motz joined.  Senior Judge Davis wrote a dissenting opinion.

─────────────────

**ARGUED:** Christopher Edwin Brown, THE BROWN FIRM PLLC, Alexandria, Virginia, for Appellants. Nicholas Valdis Cumings, BRIGLIAHUNDLEY, P.C., Tysons Corner, Virginia, for Appellees. **ON BRIEF:** Amy S. Owen, BRIGLIAHUNDLEY, P.C., Tysons Corner, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Jay Neil and Erika K. Neil[1] appeal the district court's grant of summary judgment to Defendants Wells Fargo Bank, N.A; BWW Law Group, LLC; Equity Trustees, LLC; and Banc of America Funding Corporation, 2005-4 Trustees (collectively "Wells Fargo" or "Defendants").[2] We agree with the district court that Wells Fargo was not obligated to modify the Neils' mortgage loan. The Neils therefore defaulted on their loan; Wells Fargo is entitled to summary judgment, and we affirm.

I.

A.

The Neils obtained a $604,000 loan in 2005 secured by a deed of trust on their home in Centreville, Virginia. In 2009, they asked the servicer of their mortgage, Wells Fargo, for a loan modification. In response, the Neils received two letters from Wells Fargo. The first—headlined: "You may qualify for a Home Affordable Modification Trial Period Plan"—offered to reduce the Neils' monthly payment for three months. The letter requested that they sign and return an attached Trial Period Plan ("TPP"), which reduced the Neils' loan repayment to $2,655.77 per month from November 2009 through

---

[1] The Neils have divorced. For ease of reference, we identify them collectively in this opinion.

[2] BWW Law Group and Equity Trustees are nominal defendants. Banc of America Funding Corporation—a trust that lacks the power to sue—is not a party to this appeal. The issues on appeal primarily—if not solely—concern Wells Fargo.

January 2010. The second letter told the Neils "You did it!"—"it" being having "enter[ed] into a Home Affordable Modification Trial Period Plan." J.A. 100. The TPP, along with the two letters, outlined how the Neils could apply and qualify for a permanent loan repayment modification under the Home Affordable Modification Program ("HAMP").[3]

The Neils began repaying the loan at the reduced amount and continued to do so after the trial period ended. Wells Fargo subsequently notified the Neils that they were behind on their loan repayment and in default and, in September 2010, denied the Neils' request for a permanent loan modification. The bank's stated reason for declining to modify the Neils' loan was that the net present value ("NPV") of modification, as calculated by Wells Fargo, was not "acceptable to the investor that owns [their] mortgage." The Neils stopped making monthly payments in September 2011.

On March 7, 2013, the Neils' home was sold in foreclosure. The Neils then brought suit in state court, seeking to invalidate the foreclosure and alleging that Wells Fargo breached the TPP. Wells Fargo removed the case to the U.S. District Court for the Eastern District of Virginia pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

---

[3] HAMP is a federal program in which mortgage lenders—including Wells Fargo—voluntarily participate. A borrower who requests a loan modification under HAMP is entitled to a net present value calculation—that is, a determination of whether modifying the loan is worth more to the lender than proceeding to foreclosure. If modification is worth more, the NPV is positive and the lender is required to modify the loan, but if foreclosure is worth more, the NPV is negative and the lender may decline to modify. *See, e.g.*, *Bourdelais v. J.P. Morgan Chase*, No. 3:10CV670-HEH, 2011 WL 1306311 at *1 (E.D. Va. Apr. 1, 2011).

4

B.

The Neils asserted ten counts against Defendants. Wells Fargo sought dismissal of the Plaintiffs' complaint for failure to state a claim, which the district court granted. The Neils appealed and we vacated the district court's decision. Specifically, we disagreed with the district court's conclusion that the TPP was not supported by consideration and therefore not a valid contract. *Neil v. Wells Fargo Bank, N.A.*, 596 F. App'x 194, 196–97 (4th Cir. 2014) (per curiam) (*Neil I*). We did not rule on the precise terms and conditions of the contract, leaving its interpretation to the district court. *Id.* at 197 n.5.

Because the Neils appealed only the dismissal of four of their ten counts, the claims remaining for the district court on remand were: Count I for breach of contract; Count II for slander of title; Count III for abuse of process; and Count IV to remove cloud on title. Wells Fargo counterclaimed for breach of contract, alleging that the Neils defaulted on their mortgage and seeking a deficiency judgment. In their reply to Wells Fargo's counterclaim, the Neils claimed that the bank did not have standing to collect on the Note. Both sides moved for summary judgment.

The district court denied the Neils' motion for summary judgment, held that Wells Fargo had standing to pursue its counterclaim for breach of contract, and granted the Defendants' motion except as to the amount of counterclaim. After the parties stipulated to the amount of the deficiency on the mortgage, the district court entered judgment for Wells Fargo on its counterclaim in the amount of $122,000.

This appeal followed.

5

II.

We review de novo the district court's grant of summary judgment. *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 297 n.1 (4th Cir. 2012). After *Neil I*, the district court had to, as a preliminary matter, interpret the TPP to determine whether it required Wells Fargo to permanently modify the Neils' loan. On this question turned all of the Neils' remaining claims as well as Wells Fargo's counterclaim. Because we agree that Wells Fargo was not required to modify the Neils' loan after calculating a negative NPV, we hold that the bank did not breach its contract. As a result, the Neils defaulted on their mortgage, and the district court correctly granted summary judgment to Wells Fargo.

A.

In Count I, the Neils accuse Wells Fargo of breaching the TPP by refusing to permanently modify their mortgage loan payments, despite the Neils' compliance with all terms of the contract. If the contract were governed by HAMP, however, then Wells Fargo could decline to modify after calculating a negative net present value.

1.

The Neils contend that the "four corners" of the TPP contract "said nothing of any [NPV] requirement" and therefore, the contract was not governed by HAMP rules and Wells Fargo couldn't deny a loan modification because of a negative NPV. Appellants' Br. at 21–22. According to Neils' reading of the contract, so long as the information they provided Wells Fargo upon entering into the TPP "remain[ed] true," Wells Fargo was required to modify. *Id.* at 11–12.

6

But the plain language of the contract—indeed its title—references the "Home Affordable Modification Program." J.A. 95. The contract further states that the Neils' personal information may be given to "the U.S. Department of the Treasury" and "companies that perform support services for the Home Affordable Modification Program." J.A. 97. The Neils would have us ignore this language, but Wells Fargo would give it force and have it govern the parties' conduct. Where contract language "admits of being understood in more than one way," as it does here, the language is ambiguous, and we may look to parol evidence to clarify the ambiguity. *Renner Plumbing, Heating and Air Conditioning, Inc. v. Renner*, 303 S.E.2d 894, 898 (Va. 1983). Here, the parol evidence shows that the parties agreed to a temporary HAMP modification with permanent modification contingent on a positive NPV.

The cover letter to the TPP conditioned modification and avoiding foreclosure on the Neils "qualify[ing] under the federal government's Home Affordable Modification program *and* comply[ing] with the terms of the Trial Period Plan." J.A. 91 (emphasis added). It encouraged the Neils to accept the TPP in order to "see if [they] qualif[ied] for a Home Affordable Modification." J.A. 92. The cover letter described the TPP as "the first step," with a finalized modification coming only after Wells Fargo "confirm[ed] [the Neils'] income and eligibility for the program." J.A. 93. The TPP's attached "frequently asked questions" sheet even addressed what happens when a borrower enters into the TPP but does not subsequently qualify for HAMP. J.A. 94.

In short, Wells Fargo made it clear that compliance with the express terms of the TPP was necessary but not sufficient for the Neils to receive a permanent modification;

7

qualification under HAMP—specifically, a positive NPV—was the other necessary element and a condition of the TPP. That contention squares with our decision in *Neil I*, where we explained that the TPP was "relate[d] to a federal program . . . called the Home Affordable Modification Program" and that the Neils' reduced mortgage payments were temporary unless they "ultimately qualified for HAMP." 596 F. App'x at 195.

2.

Under a TPP governed by HAMP, the lender is "required to offer some sort of good-faith permanent modification . . . consistent with HAMP guidelines" once the borrower "fulfill[s] the TPP's conditions." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 565 (7th Cir. 2012); *see also Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 235 (1st Cir. 2013) (rejecting lender's contention that, after borrower met all the conditions of the TPP, it could still refuse to permanently modify). We do not hold otherwise. We do, however, examine whether the condition precedent triggering Wells Fargo's duty to modify occurred—that is, whether the Neils "fulfilled the TPP's conditions." *Wigod*, 673 F.3d at 565.

Because the TPP was governed by HAMP, one of the conditions the Neils had to satisfy was having a positive NPV. And because Wells Fargo calculated a negative NPV, it could deny a permanent loan modification, and it therefore did not breach the TPP by denying modification.

The Neils say that Wells Fargo used inaccurate information in calculating the NPV because Wells Fargo indicated in its September 2010 letter that the NPV was calculated on October 6, 2009—before the TPP was even signed. But the same letter listed "NPV

8

Input Values" (such as the Neils' monthly income and obligations) that Wells Fargo did not receive until after October 2009, so the NPV calculation date appears to be a typographical error. Additionally, the letter asked the Neils to "review the input values" and provide documentation within thirty days to correct any inaccuracies, which the Neils didn't do. J.A. 102. Finally, the Neils do not suggest that the financial information they provided to Wells Fargo before and after October 6, 2009 would have resulted in a positive NPV. Thus, the date of the NPV calculation is inconsequential in deciding whether the Neils fulfilled all the necessary conditions for a permanent HAMP modification.

Finally, while Wells Fargo's delay in sending the permanent modification rejection letter is regrettable, it is also immaterial. Our holding does not "permit the lender to avoid any responsibility simply by withholding action until the trial period ends." Dissenting Op. at 25. Had the NPV been positive and had the Neils otherwise fully complied with the TPP, Wells Fargo would have been required to grant a permanent modification effective at the end of the TPP, regardless of when Wells Fargo calculated that NPV. The bank would have had no right to foreclose. Here, though the record may be unclear as to when Wells Fargo determined that the Neils had a negative NPV, it is undisputed that Wells Fargo did so determine, and therefore it was never under any obligation to permanently modify the mortgage loan.

After the TPP's temporary modification expired in February 2010, the Neils were required to continue making repayments on their original schedule of $3,476 per month until July 2035. Instead, the Neils paid $2,655 until September 2011, at which point they

9

stopped making payments altogether. Wells Fargo notified the Neils that they were in default in March 2010. After the Neils failed to cure their default, Wells Fargo had the right to foreclose on the property, which it did on March 7, 2013. Because the Neils plainly failed to qualify for a HAMP modification, we do not reach the contested factual issue of whether the Neils misrepresented their financial status to Wells Fargo.

We therefore affirm the district court's grant of summary judgment as to Count I of the Neils' complaint.

## B.

In Counts II and III, the Neils accuse Defendants of Slander of Title and Abuse of Process, respectively. These claims are based on the notion that "there was no default" on the mortgage loan and that Defendants therefore "published false words" and "maliciously misused and/or abused process" by claiming that the Neils had defaulted. J.A. 42–43. Having held that the Neils were required to resume full monthly payments on their mortgage beginning in February 2010, and because they undisputedly did not, there was indeed a default, and Counts II and III necessarily fail.

## C.

In Count IV, the Neils ask the court to "Remove Unauthorized Documents from the Land Record," specifically ones noting that the Neils defaulted and Wells Fargo foreclosed on the Neils' home. Because the Neils did default and Wells Fargo did—properly—foreclose, there are no false or unauthorized documents in the land record, and Count IV also fails.

10

D.

We turn now to the district court's grant of summary judgment to Wells Fargo on its counterclaim for breach of contract, alleging that the Neils still owed $122,462.65 after their home was sold in foreclosure. The Neils first argue that they were never actually in default, and that Wells Fargo therefore had no right to foreclose. Having already dealt with this argument, we address the Neils' second argument: that Wells Fargo lacked standing to collect, and thus lacks standing to sue, on the Note.

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art III, § 2. One element of this constitutional requirement is that claimants must have standing to sue. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). The plaintiff—in this case, cross-plaintiff Wells Fargo—bears the burden of establishing the three "irreducible minimum requirements" of Article III standing:

> (1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly . . . trace[able] connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013) (alteration in original) (internal quotation marks omitted).

The Neils' mortgage loan (memorialized in a 2005 note) listed "Wells Fargo Bank, N.A." as the lender. J.A. 54. U.S. Bank later acquired the Note, and U.S. Bank made Wells Fargo the Note's servicer. The Neils argue that, because Wells Fargo

11

doesn't hold the Note, it would enjoy no benefit from the Note being paid in full, and therefore suffered no injury-in-fact by the Neils' default. This is incorrect.

Despite not being the noteholder, Wells Fargo had standing to enforce the Note as its servicer. The Note itself designates the "Loan Servicer" as the party "that collects Periodic Payments due under the Note." J.A. 80. Virginia—the state whose laws govern the Note—has adopted the Uniform Commercial Code and allows parties to delegate their legal rights to agents as U.S. Bank did here. Va. Code Ann. § 8.1A-103; *Lambert v. Barker*, 348 S.E.2d 214, 216 (Va. 1986). By appointing Wells Fargo as its loan servicer, Wells Fargo became U.S. Bank's agent with the power to "[d]emand, [sue] for, recover, collect and receive each and every sum of money, debt, account and interest . . . belonging to or claimed by U.S. Bank." J.A. 392. This created a legally protected interest sufficient to grant Wells Fargo standing to sue for the deficiency on the Note. *See, e.g.*, *CWCapital Asset Mgmt., LLC v. Chicago Props., LLC*, 610 F.3d 497, 500–01 (7th Cir. 2010) (explaining that mortgage-loan servicers, when given authority to collect on notes, have Article III standing and are a party in interest); *see also Lambert*, 348 S.E.2d at 216 (Virginia allows authorized agents of noteholders to collect on the note as if they were holders.).

We do not reach the question of whether a grant of power of attorney alone suffices to grant standing because U.S. Bank did not grant Wells Fargo power of attorney in a vacuum. "[A]uthoriz[ation] to sue based *solely* on a power of attorney" may not create standing, but "the operative question is whether the plaintiff possesses the right to be enforced." *Marina Mgmt. Servs., Inc. v. Vessel* My Girls, 202 F.3d 315, 318–19 (D.C.

12

Dir. 2000) (emphasis added) (internal citations omitted). Here, Wells Fargo did not "solely" have power of attorney, it actually "possessed the right to be enforced" under Virginia law allowing the transfer of the legal rights of a note holder to an agent.

## III.

For the reasons given, we affirm the district court's judgment.

*AFFIRMED*

DAVIS, Senior Circuit Judge, dissenting:

I respectfully dissent.

I.

In 2005, the Neils borrowed $604,000 from Wells Fargo to purchase a personal residence. On October 5, 2009, a Wells Fargo representative spoke with the Neils by telephone, asked about their financial situation, and informed them about the possibility of entering a TPP. On October 6, 2009, Wells Fargo mailed the Neils a document labeled "Home Affordable Modification Program Loan Trial Period" describing the federal HAMP program designed to assist homeowners at risk of foreclosure. Wells Fargo also mailed a letter that began with "You may qualify," J.A. 91, which indicated that the Neils had to mail to Wells Fargo, by no later than November 1, 2009: (1) two copies of the signed TPP; (2) the first TPP payment; (3) the enclosed Hardship Affidavit; (4) a signed and dated copy of the IRS Form 4506-T for each borrower; and (5) documentation to verify all income of each borrower.

Wells Fargo also mailed the Neils a TPP. The TPP relied upon some of the financial information that the Neils provided orally during the October 5, 2009 telephone call with Wells Fargo. Section 1 of the TPP required a Hardship Affidavit stating that the Neils would be in default in the near future, documents to verify income, an IRS Form 4506-T, certification that there has been no change in ownership of the property and that the home is the Neils' principal residence, certification that the documents and information submitted were true and correct, and verification that the Neils would obtain

14

credit counseling if requested. Section 2 of the TPP provided that the Neils were required to make three reduced monthly payments of $2655.77 starting in November.

The TPP provided that if the Neils' representations in Section 1 continued to be true in all material respects and they complied with the requirements in Section 2 of the TPP, then Wells Fargo would send them a Modification Agreement to permanently modify their loan. The TPP also specifically provided that "TIME IS OF THE ESSENCE" and stated:

> If prior to the Modification Effective Date, (i) the lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate.

*Id.*

The Neils also received another letter dated October 6, 2009, which began with "You did it!" J.A. 100. It stated that the Neils had entered into the TPP plan, and it provided information on options for housing counseling. The Neils signed the TPP and made the three reduced monthly payments to Wells Fargo. The TPP ended on February 1, 2010. However, following the final payment, Wells Fargo did not provide a permanent modification to the Neils. Months later, on September 3, 2010, Wells Fargo informed the Neils that they were denying the permanent modification "based on the results of [their] NPV calculation." J.A. 102. The Neils defaulted on their loan, and their property was sold at a foreclosure sale in March 2013.

15

In May 2013, the Neils filed this suit seeking to overturn the foreclosure sale, arguing, among other things, that the TPP is an enforceable contract that obligated Wells Fargo to permanently modify the terms of the Neils' loan. On September 4, 2013, the district court dismissed the case for failure to state a claim because the TPP was not a contract. The Neils appealed the district court's judgment.

In an unpublished decision, a panel of this Court determined that the TPP was an enforceable contract, vacated the dismissal, and remanded the case to the district court for further proceedings. *Neil v. Wells Fargo Bank, N.A.*, 596 F. App'x 194 (4th Cir. 2014).

On remand, the Appellants moved for summary judgment as to Count I (Breach of Contract), Count II (Slander of Title), Count IV (Remove Cloud on Title), and Wells Fargo's counterclaim seeking a deficiency judgment. Appellees individually moved for summary judgment on all claims. On July 20, 2015, the court entered an order granting summary judgment to the Appellees on all claims, and on August 19, 2015, entered a Stipulated Final Order containing the parties' agreement as to the amount of the outstanding balance on the mortgage loan, post-foreclosure.

## II.

As to the Neils' claims, the parties dispute three related issues: (1) whether the TPP required the Neils to establish a positive NPV; (2) if so, whether the terms of the TPP required Wells Fargo to determine if the Neils qualified for the TPP (including its calculation of NPV) at a particular time; and (3) whether, apart from the NPV calculation, the Neils made misrepresentations that disqualified them from enforcing the TPP.

16

Based upon the record before us, I would hold that the district court overlooked issues of law and fact and thereby erred in granting summary judgment to Wells Fargo.

A.

"The U.S. Department of the Treasury implemented HAMP to help homeowners avoid foreclosure amidst the *sharp decline in the nation's housing market in 2008*." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 554 (7th Cir. 2012) (emphasis added). As part of HAMP, the Secretary of the Treasury negotiated Servicer Participation Agreements with home loan servicers who agreed to "identify homeowners who were in default or would likely soon be in default on their mortgage payments, and to modify the loans of those eligible under the program." *Id.* at 556. Under HAMP, servicers determine a homeowner's eligibility through a "three-step process:" (1) the servicer determines whether the borrower meets certain threshold requirements under HAMP; (2) the servicer calculates a modification payment; and (3) the servicer applies a NPV test "to assess whether the modified mortgage's value to the servicer would be greater than the return on the mortgage if unmodified." *Id.* at 556–57. If "the value of the modified mortgage would be lower than the servicer's expected return after foreclosure," then the servicer is not required to offer a modification. *Id.* at 557. After determining eligibility, the servicer implements "a Trial Period Plan (TPP) under the new loan repayment terms .

17

. . ." *Id.* If the borrower meets its obligations under the TPP, then the servicer must offer a permanent modification. *Id.*[1]

In *Wigod*, a widely-cited case, the Seventh Circuit held that a lender owes a permanent modification to a homeowner who satisfies the conditions in the TPP. *Id.* at 565–66. In *Wigod,* Wells Fargo mailed a signed copy of a TPP to the borrower, Wigod, with a letter congratulating her on her approval for a trial modification. The court reasoned that these actions "communicated to Wigod that she qualified for HAMP and would receive a permanent 'Loan Modification Agreement' after the trial period, provided she was 'in compliance with this Loan Trial Period and [her] representations . . . continue[d] to be true in all material respects.'" *Id.* at 562 (alterations in original). The court recognized that the TPP is contingent on the borrower meeting the conditions of the TPP. But once the conditions of the TPP were met, "it was certainly required to offer

---

[1] Courts that have examined common law claims to enforce agreements to modify loans under HAMP have taken different positons. *See* Tammy J. Raduege, *Enforceability of Trial Period Plans (TPP) Under the Home Affordable Modification Program (HAMP)*, 88 A.L.R. Fed. 2d 331 (2014) (collecting cases). Some early decisions denied that contract law could provide a viable claim to enforce rights created pursuant to HAMP, reasoning that TPPs lacked definite terms or lacked consideration. *See, e.g.*, *Senter v. JPMorgan Chase Bank, N.A.,* 810 F.Supp.2d 1339, 1348–49 (S.D. Fla. 2011). Others reasoned that state breach-of-contract claims fail to state a cause of action independently of HAMP. *See, e.g.*, *Bourdelais v. J.P. Morgan Chase*, No. 3:10–CV–670–HEH, 2011 WL 1306311, at *4 (E.D. Va. Apr. 1, 2011). Later opinions have tended to take a different approach. *See, e.g.*, *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 351 (D. Mass. 2011) ("[D]efendant contends that because the TPPs originated out of the HAMP program, plaintiffs cannot vindicate any rights that relate to HAMP. That argument is plainly without merit."); *Nash v. Green Tree Servicing, LLC*, 943 F.Supp.2d 640, 647 (2016) (holding that the facts asserted that a breach of contract may have occurred under Virginia law based on a TPP Agreement). As mentioned, we held in the prior appeal in this case that the parties' TPP is an enforceable contract.

*some* sort of good-faith permanent modification to Wigod consistent with HAMP guidelines." *Id.* at 565.

Several circuits have adopted the *Wigod* approach.[2] *See, e.g. Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 883 (9th Cir. 2013), *as amended on reh'g in part* (Sept. 23, 2013) ("We believe the reasoning in *Wigod* is sound."); *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 235–36 (1st Cir. 2013) (recognizing that if the homeowner complies with the conditions of the TPP, the lender breaches the contract by failing to provide a permanent modification agreement by the modification effective date); *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1260 (10th Cir. 2016) (finding that the language in the TPP documents of Bank of America "clearly and unambiguously" promised to provide permanent HAMP loan modifications to borrowers who comply with the terms of their TPPs). The *Corvello* court explained that the conditions of the TPP "cannot convert a purported agreement setting forth clear obligations into a decision left to the unfettered discretion of the loan servicer." 728 F.3d at 883. Therefore, "the servicer could not unilaterally and without justification refuse to send the offer." *Id.*

The Neils contend that the NPV calculation cannot be used as a basis to deny their loan modification because it was not mentioned in the language of the TPP. In response, Appellees argue that the TPP did not explicitly identify all conditions and requirements

---

[2] We recognized *Wigod* in *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 776 n.4 (4th Cir. 2013). *Spaulding* differed from this case because there, the homeowners and Wells Fargo never entered a valid contract. Wells Fargo rejected Spaulding's HAMP application because the borrower failed to provide the requested documents within the specific time period. *Id.* at 777. Consequently, there was never a "meeting of the minds," *id.* at 777–78, evidencing a contract to be breached. *Id.* at 776.

19

for a permanent loan modification.  According to Wells Fargo, "the Second Step of the 'Two Step Documentation Process'" required "Wells Fargo [to] ascertain[] whether the Neils actually qualified for a permanent modification" including by meeting the NPV requirement under HAMP.  J.A. 646.

Although the terms of the TPP never specifically mention the NPV, the TPP does state that the Neils must provide financial documentation to determine if they qualify.  While the exact basis for qualifying is not elaborated upon in the terms of the TPP, the correspondence sent with the TPP explicitly states "[i]f you qualify under the federal government's Home Affordable Modification Program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure." J.A. 91.  The TPP also states that the Neils "agree that the Lender [would] not be obligated or bound to make any modification of the Loan Documents if [they] fail to meet any one of the requirements under [the TPP]."  J.A. 96.  Thus, the TPP was contingent on the Neils meeting the financial qualifications for the modification, including the NPV calculation.  *See Wigod*, 673 F.3d at 562 (stating that if a borrower does not meet the NPV requirement, Wells Fargo "could have and should have denied her a modification on that basis.").

B.

As I have explained, "[o]nce the bank determine[s] that a borrower ha[s] complied and the representations [a]re still true, then the bank [i]s required by the agreement to offer a permanent modification."  *Corvello*, 728 F.3d at 884.  The more difficult question in this case is, under the terms of the TPP, *when must this determination occur*?

20

Under the timeline that HAMP normally follows, a lender has time to review the documents and approve the borrower for a TPP prior to the trial period beginning. The borrower signs two copies of the TPP and returns them along with additional financial documentation to the lender to review before signing and returning the executed TPP. According to the Seventh Circuit: "Under the terms of the TPP Agreement, then, that moment [is the lender's] opportunity to determine whether [the borrower] qualified." *Wigod*, 673 F.3d at 562. When the lender countersigns and mails a copy of the TPP to the borrower with a letter congratulating her on her approval for a trial modification, this communicates to the borrower that she has qualified. *Id.* Thus, according to the Seventh Circuit, the lender needed to determine whether the borrower qualified under the HAMP guidelines prior to the commencement of the trial period. *Id.*

The Neils take the position that Wells Fargo had already determined that the Neils met the NPV requirements as a threshold determination before they entered the TPP. According to the Neils, the NPV in this case was calculated on October 6, 2009, the day the TPP agreement was offered, based on information the Neils provided by phone on October 5.[3] The Neils cite the deposition of Wells Fargo's corporate representative, Brock Wiggins, for support. The Neils also rely on the September 3, 2010 denial letter,

___

[3] The Neils were first denied an earlier modification on June 24, 2009. Thus, there is at least a viable argument that they were pre-approved for the TPP based upon the financial information they had previously provided as opposed to simply verbal representations made over the phone.

which indicated that the NPV calculation that resulted in the denial of the permanent modification was completed on October 6, 2009, a date the majority says is a typo.

Wells Fargo does not dispute that the September 3, 2010 letter identifies the October 6 date for the NPV calculation, but does dispute that the actual NPV calculation was performed with information available on October 6, 2009. Wells Fargo claims that the record demonstrates that any calculation on October 6, 2009 was based on verbal financial information that was not verified until the Neils submitted full documentation of their income and expenses with the TPP. According to Wells Fargo, the NPV value was updated as information pertaining to the factors required for the NPV calculation as of October 5, 2009 was verified or became available. Wells Fargo explains that its decision to provide the Neils a TPP based on their verbal financial information was consistent with HAMP directives in place at the time, which "gave servicers the option of placing a borrower into a trial period plan based on verbal financial information obtained from the borrower, subject to later verification during the trial period." Home Affordable Modification Program Supplemental Directive 10–01 at 1 ("SD 10-01"); *see also* Home Affordable Modification Program Supplemental Directive 09–01 at 17("SD 09-01") ("Servicers are not required to verify financial information prior to the effective date of the trial period.").

According to the notification obligation outlined in the Supplemental Directive, if after receiving the TPP the bank determines that a borrower is not eligible for a modification, the bank should "*promptly communicate that determination to the borrower in writing . . .*" SD 09-01 at 15 (emphasis added). In finding that there was a

22

viable claim for breach of contract, the *Wigod* court considered it significant that the bank failed to timely notify the borrowers that they did not qualify for the TPP. *See Wigod*, 673 F.3d at 562. Indeed, if a borrower does not qualify for the HAMP program, the servicer must not only alert the borrower, but must consider and inform the borrower of alternative options. *See Corvello,* 728 F.3d at 881.

Importantly, just as in this case, in *Wigod*, Wells Fargo argued that "Treasury guidelines then in force allowed the servicer to verify, after initiating a trial modification, that the borrower satisfied all government and investor criteria for a permanent modification, and that Wigod did not." *Id.* at 558. The court acknowledged that "[the] Treasury modified its directives on the timing of the verification process in a way that affects this case," and that under the guidelines then in effect, "a servicer could initiate a TPP based on a borrower's undocumented representations about her finances." *Id.* at 557. However, the court clearly reasoned that Wells Fargo needed to make a final determination as to whether the borrower qualified prior to the trial period beginning.

In *West v. JP Morgan Chase,* 154 Cal. Rptr. 3d 285, 299 (2013), the California Court of Appeals, applying the *Wigod* approach, considered whether the lender in that case, Chase Bank, could deny a permanent modification to a borrower, West, who failed to meet the NPV requirement during a later evaluation. The court determined that "Chase Bank's reevaluation upon completion of the trial period would be limited to determining whether West complied with the terms of the Trial Plan Agreement and whether West's original representations remained true and correct." *Id.* at 299. The court concluded that the plaintiff asserted a viable claim that Chase Bank breached the

23

TPP when it failed to offer the borrower a permanent loan modification under the facts alleged. *Id.* at 300.

The facts of this case make it difficult to pin down when Wells Fargo officially evaluated whether the Neils met the conditions of the TPP. The Neils received a letter congratulating them on approval for the trial modification at the same time they received the TPP to sign. Thus, the trial period began prior to the Neils submitting the signed TPP and required documents. In addition, unlike in *Wigod*, Wells Fargo never countersigned and mailed a final copy of the TPP to the Neils. This also makes it difficult to discern whether the Neils were officially evaluated even once they began making their TPP payments in November 2009.

Crediting Wells Fargo's explanation that the Neils were pre-approved for a TPP based upon the representations they made over the phone that was subject to a later reevaluation, the reevaluation still had to occur within some defined time period. I would hold that the reevaluation had to occur before the trial period ended. I would further hold that under the terms of the TPP, any reevaluation after the preapproval had to be limited to whether the Neils' representations remained "true in all material respects," J.A. 97, after they were initially approved on October 6, 2009. The TPP specifically provides that "TIME IS OF THE ESSENCE" and establishes the Modification Effective Date as the critical time by which the Lender must provide "a fully executed copy of this Plan and the Modification Agreement" and determine that the borrower's "representations in Section 1 are no longer true and correct." J.A. 96. I recognize that an alternative reading of this provision is that if either party does not meet the conditions by the Modification

24

Effective date, the default is for the contract to terminate. *See* J.A. 96 (providing that without meeting the conditions by the Modification Effective Date "the Loan Documents will not be modified and this Plan will terminate"). But I am concerned that this latter interpretation, should it be accepted, would permit the lender to avoid any responsibility simply by withholding action until the trial period ends. *See Young*, 717 F.3d at 235 (noting that such "interpretation would permit [the lender] to exercise an unfettered right to withhold a permanent modification offer for an uncertain period of time after the modification effective date has passed, thereby erasing the benefits to the plaintiff of her compliance with the TPP"). *See also Fried v. JP Morgan Chase & Co.*, No. 16-3069, 2017 WL 929752, at *6 (3d Cir. Mar. 9, 2017) ("The proverb 'what is good for the goose is good for the gander' applies: the HAMP's provisions do not bind the parties to a mortgage modification only when they benefit Chase.").

Accordingly, I would hold that, as a matter of law, Wells Fargo breached the terms of the TPP when it failed to notify the Neils that they did not qualify for nearly six months after the TPP ended. Nevertheless, because this breach may not be dispositive of the Neils' claims, I would remand this action for further proceedings as described below.

C.

Assuming the Neils had a continuing obligation to satisfy the eligibility requirements under the TPP that Wells Fargo could evaluate after the trial period ended, I discern a factual determination required in this case that the district court did not complete and likely could not make on summary judgment.

25

The Appellees' argument that the Neils were ineligible for a TPP is two-fold: the Appellees argue that the Neils failed to meet the NPV requirement and that the Neils made material misrepresentations. The Appellees point to particular discrepancies between what Mr. Neil represented and what the documents that the Neils submitted demonstrated. Specifically, Wells Fargo claims that the Neils provided inconsistent (if not contradictory) evidence of expenses for food and child care, as well as inconsistent evidence of income and assets. Perhaps, the most damaging of these claims is Wells Fargo's assertion that the Neils had savings that would have allowed them to continue to make their mortgage payments at the time that they entered into the TPP. The Neils admit that they were not in default at the time they entered the TPP and could have continued to pay their loans for approximately one year. As a result, Wells Fargo takes the position that in October 2009, the Neils were not in imminent default, and the Hardship Affidavit constituted a misrepresentation. The Neils respond that they did face an imminent default, albeit not within the year, and dispute whether the "near future" default language in the TPP means less than one year.

The relevant HAMP Directives do not define "imminent default." The Directives do put the onus on the servicer in making a determination, providing that:

> A borrower that is current or less than 60 days delinquent who contacts the servicer for a modification, appears potentially eligible for a modification, and claims a hardship must be screened for imminent default. The servicer must make a determination as to whether a payment default is imminent based on the servicer's standards for imminent default and consistent with applicable contractual agreements and accounting standards. If the servicer determines that default is imminent, the servicer must apply the Net Present Value test.

SD 09–01 at 3–4. Thus, under these directives, Wells Fargo was responsible for screening the Neils to determine if they faced imminent default, and the Neils could potentially be current on their payments and still face imminent default.

On the other hand, in *Pennington v. HSBC Bank USA, N.A.*, 493 F. App'x 548 (5th Cir. 2012), the Fifth Circuit considered whether the TPP includes a continuing obligation to satisfy the financial-eligibility requirements. The court considered the claims of two sets of borrowers. *Id.* at 550. The second borrower, Smith, was not late or behind, but wanted to reduce her payments. *Id.* at 551. She was preapproved for a TPP, but later denied a permanent modification. As a result, she became behind on her payments. *Id.* The court relied on the paragraph in the TPP which stated "[i]f . . . any representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement." *Id.* at 553–54. The court concluded that modification is contingent on the financial-hardship representations continuing to be true and by Smith's own pleadings, she was ineligible for a HAMP loan modification, because she could not meet the financial-hardship requirement. *Id.* at 554. The Fifth Circuit thus affirmed dismissal of Smith's claims. *Id.* at 554.

Also weighing in favor of the Appellees' argument is the allegation that, when the Neils were informed that they did not meet the NPV, they challenged Wells Fargo's calculation and the result was the same denial. Moreover, the Appellees allege that the Neils were later approved for a HAMP TPP, which the Neils rejected, but which could have prevented foreclosure. This suggests that on some level, Wells Fargo met the spirit of *Wigod*'s requirement that Wells Fargo could have complied with the terms of the

agreement by offering a modification with slightly different terms, as long as Wells Fargo offered "*some* sort of good-faith permanent modification to [the Neils] consistent with HAMP guidelines." *Wigod,* 673 F.3d at 565.

All this persuades me that there are genuine disputes of material fact regarding both whether the Neils made misrepresentations or otherwise failed to meet the conditions of the TPP, and the timing of when the relevant determinations occurred, and thus the district court should have denied summary judgment for Wells Fargo on this record. *See Bolone v. Wells Fargo Home Mortg., Inc.,* 858 F. Supp. 2d 825, 833 (E.D. Mich. 2012) (considering whether the plaintiff failed to comply with the terms of the TPP by not submitting proof of income documents and finding that a genuine dispute of fact existed in light of conflicting evidence). *See also Nash v. Green Tree Servicing, LLC,* 943 F. Supp. 2d 640, 647 (E.D. Va. 2013) (holding that the facts asserted that a breach of contract may have occurred under Virginia law based on a TPP Agreement, but concluding the question is best left to the finder of fact). I would vacate the judgment on the Neils' claim for breach of contract and remand for further proceedings. [4]

### III.

---

[4] The Neils assert that the damages resulting from the breach are the unlawfully imposed late fees, penalties, inspection fees, other default related fees, the resulting compounded interest, and factors otherwise contributing to an increase in money owed to the Lender, and that Wells Fargo be required to correct the negative credit reporting. In addition, the Neils seek specific performance of the TPP and equitable rescission of the foreclosure. I would leave to the district court the task of sorting out issues of relief in the post-foreclosure posture of the case.

28

The Neils challenge the district court's conclusion that Wells Fargo had standing to pursue the counterclaim for a deficiency judgment after the foreclosure sale of the property. It is undisputed that Wells Fargo does not own the note. The majority credits Wells Fargo's assertion that it has standing because as the servicing agent, its servicing contract authorized it to collect, demand, and even to file suit for amounts owed. In so concluding, the majority apparently accepts that a mere power of attorney is insufficient to afford standing, but reasons that "U.S. Bank did not grant Wells Fargo power of attorney in a vacuum." *Ante* 12. I take it that what the majority means by this is that a power of attorney that explicitly includes the right to sue enjoys some exalted status under Article III of the Constitution. I respectfully disagree with the majority's analysis.

The issue presented is whether Wells Fargo's authority is merely by way of a power of attorney (however exalted it may be), on the one hand, on the basis of which it therefore lacks standing, *see CWCapital Asset Mgmt., LLC v. Chicago Props., LLC*, 610 F.3d 497, 500–01 (7th Cir. 2010); *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17–18 (2nd Cir. 1997) or, on the other hand, whether it is an "assignee for collection." *Sprint Commc'ns Co. v. APCC Services, Inc.,* 554 U.S. 269, 285 (2008), and thereby is endowed with Article III standing.[5] I fail to see how the Virginia Uniform Commercial Code (or the related *dictum* cited by the majority from *Lambert v. Barker*, 348 S.E.2d 214, 216 (Va. 1986), *ante* 12), has much to do with this issue of federal

---

[5] *Cf. CWCapital Asset Mgmt., LLC,* 610 F.3d at 501 ("There is no doubt about Article III standing in this case; though the plaintiff may not be an assignee, it has a personal stake in the outcome of the lawsuit because it receives a percentage of the proceeds of a defaulted loan that it services.").

constitutional law. No one asserts there has been an assignment of a claim in this case. On this record, I am persuaded that Wells Fargo's counterclaim rests on nothing more than a power of attorney (however exalted it may be) and that Wells Fargo is not an "assignee for collection" within the reasoning of *Sprint Commc'ns Co.* Accordingly, I would reverse the judgment of the district court insofar as it finds that Wells Fargo enjoys Article III standing.

## IV.

For the reasons set forth above, I would vacate in part, reverse in part, and remand this action for further proceedings. Respectfully, I dissent.